## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02589-DDD-MEH

**DAVID B. HOFF**, an individual,

      Plaintiff,

v.

**AMENDED AND RESTATED ANADARKO PETROLEUM CORPORATION CHANGE OF CONTROL SEVERANCE PLAN,** an ERISA employee benefit plan, and

**ANADARKO PETROLEUM CORPORATION HEALTH AND WELFARE BENEFITS ADMINISTRATIVE COMMITTEE,** as Plan Administrator and fiduciary,

      Defendants.

---

## PLAINTIFF'S OPENING BRIEF

---

Plaintiff, David B. Hoff ("Plaintiff" or "Mr. Hoff"), by and through his undersigned attorneys, hereby submits his Opening Brief in support of his claims under the Employee Retirement Income Security Act of 1974 ("ERISA") for: (1) improper denial of benefits; and (2) breach of fiduciary duty, against Defendants, the Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan (together with additional amendments,[1] the "Plan") and the Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee, as Plan Administrator ("Plan Administrator" or "Committee").

---

[1] The Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan was amended with a First Amendment adopted on April 15, 2008, a Second Amendment adopted on October 26, 2009, and a Third Amendment adopted on December 20, 2010.  See Administrative Record ("AR") (Doc. 26-1) at pp. Occidental Hoff 000001-30 (hereafter "AR 1-30").

## ISSUES PRESENTED

1.      Was Defendants' consideration of criteria outside of the plain language of the Plan to deny Plaintiff's benefits an abuse of discretion (arbitrary and capricious)?

2.      Did the Plan Administrator breach its fiduciary duty owed to Plaintiff by expressly refusing to comply with the plain language of the Plan and elevating its conflicting interest over its duty to act for the sole benefit of Plaintiff as a Plan participant and beneficiary?

## ARGUMENT SUMMARY

Plaintiff is entitled to separation benefits under Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan because, on March 9, 2020, his job duties and responsibilities for Occidental Petroleum Corporation ("Oxy") were materially and adversely diminished in comparison to the duties and responsibilities he held as Project Manager in the Plants and Major Projects Division for Anadarko Petroleum Corporation d/b/a Western Midstream Partners, LP ("WES") (together "Anadarko"), just prior to its acquisition by Oxy on August 8, 2019 (the "Change in Control").

Prior to the Change in Control, on August 7, 2019, Plaintiff had responsibility over a $450 Million combined project budget, and required leading and coordinating all aspects, scheduling, scope, and management of a team of over 300 people.  In contrast, by March 9, 2020, and continuing through June 4, 2020, Plaintiff's responsibilities had deflated to managing one single $600,000 project, and separately, providing engineering support to the Mechanical Integrity ("MI") team by answering engineering questions for service evaluations and making other supporting calculations - a role with no management duties or responsibilities.

Plaintiff admits that his title of "Project Manager" did not change between August 7, 2019 (the day prior to the Change in Control) and June 4, 2020 (the date of his termination for Good Reason).  Plaintiff admits that between March 9, 2020 and June 4, 2020, Oxy did not have any comparable size projects to the one he was managing on August 7, 2019.  Plaintiff admits that he was not demoted in title or salary by Oxy.  Plaintiff admits that he was never promised that the projects he would manage as Project Manager would only ever increase in size.  Plaintiff also admits that he was never guaranteed certain size projects or certain levels of responsibility. Plaintiff admits that there may have been larger projects that could have been assigned to him in the future if he had stayed employed with Oxy.  Finally, Plaintiff admits that the material and adverse diminishment of his duties and responsibilities was not caused by the Change in Control, nor was it caused by any intentional conduct by Oxy.  Plaintiff admits each of these facts, and is still entitled to separation benefits under the Plan.

Indeed, nothing in the Plan's unambiguous language requires that, to be eligible for separation benefits, Plaintiff's job title changed, that Oxy made an express (or implied) promise that Plaintiff would only manage projects increasing in size throughout his career, that Oxy made an express (or implied) promise that Plaintiff would only work on certain sized projects,  that there was opportunity for potential new projects sometime in the future, or that there was any particular reason or cause, whether within or outside of Oxy's control, for the material and adverse diminishment of Plaintiff's duties and responsibilities.  When the Plan Administrator required each of these facts to be true for Plaintiff to be entitled to benefits, the Plan Administrator abused its discretion and acted in its conflicting financial interest of preserving

company resources during an "economic crisis" in direct violation of its fiduciary duties to Plaintiff.

None of the Plan Administrator's justifications for denial of Plaintiff's claim changes the one dispositive fact: Plaintiff's duties and responsibilities on August 7, 2019 of managing a $450 Million project and leading a team of over 300 people were materially and adversely diminished as of June 4, 2020 when Plaintiff was managing one $600,000 project and answering engineering questions for service evaluations. Every other consideration by the Plan Administrator used in order to deny Plaintiff's claim is contrary to the plain language of the Plan.

The Plan Administrator, operating under a dual-role conflict of interest, also breached its fiduciary duty to Plaintiff when it inserted requirements that were not required by the Plan and interpreted unambiguous Plan language in order to deny Plaintiff's claim for benefits. The Court should view the Plan Administrator's denial of Plaintiff's claim for benefits with an especially critical eye, where, as here, every member of the Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee (the Plan Administrator) who was involved in denying Plaintiff's claim is an executive-level, long-term employee of Oxy, the Plan payor, who benefitted from limiting Oxy's payout to Plaintiff of the nearly $700,000 he is entitled to under the Plan by keeping Oxy's financial resources with Oxy during what the Plan Administrator characterized as "a time the oil industry was facing dire economic hardships."

## THE RELEVANT PLAN LANGUAGE

The Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan is an employee benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1), effective September 1, 2007. (AR 1-30). The Anadarko Petroleum

Corporation Health and Welfare Benefits Administrative Committee is the Plan's named fiduciary and Plan Administrator.  (AR 7, 17, 26).

As an employee of Anadarko prior to the Change in Control, Plaintiff was a "Participant" of the Plan, as defined in Section 3.1 of the Plan.  (AR 5-6, 8, 14).  As such, Plaintiff was a beneficiary of the Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(8).

On August 8, 2019, Oxy acquired Anadarko pursuant to a merger agreement by and among Anadarko, Oxy and a subsidiary of Oxy, Western Midstream (WES) which acquisition constituted a "Change of Control" under the Plan.  (AR 3).

Under Article IV, "[a] Participant shall be entitled to receive Separation Benefits . . . if a Change of Control occurs and his or her Employment terminates under a circumstance specified in Section 4.2(a)."  (AR 8).  Section 4.2(a) lists "Terminations Which Give Rise to Separation Benefits Under this Plan" as including: "(ii) A termination for Good Reason during the Applicable Period; provided, that, the Participant terminates his or her Employment within ninety (90) days of such occurrence."  (AR 8).

Pursuant to Article II(s)(i) of the Plan, a Good Reason event occurs when "[a] Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control."  (AR 6).

Under the Plan, Participants may resign their employment within 90 days of a Good Reason event if the event occurs in the Applicable Period (AR 2), which in this instance, is any time between August 9, 2019 (the Change in Control) and August 8, 2020 (the first anniversary of the Change of Control) (AR 2) and receive Separation Benefits from the Plan.  (AR 8).

Notably, under the Plan's language, the material and adverse diminishment of duties and responsibilities does not have be as a result of the Change in Control, and there is nothing in the Plan's unambiguous language that exempts an economic-based diminishment from constituting Good Reason. (AR 6). Nothing in the Plan speaks to, nor requires, any particular causation, nor is there any requirement that a Participant establish the material and adverse diminishment of duties and responsibilities was intended, intentional, or caused by Oxy or WES. (AR 6).

## BACKGROUND FACTS

Plaintiff was a Project Manager for the Plants and Major Projects Division for Anadarko prior to its acquisition by Oxy on August 8, 2019, the "Change in Control." With the Change in Control, Oxy became Plaintiff's employer.

### Plaintiff's Employment Prior to the Change in Control

Just prior to the Change in Control, Plaintiff was Project Manager for the Latham Gas Plant Project. The Latham Gas Plant Project was the largest project in the Major Projects Division at the time, had a $450 Million combined budget, and required leading and coordinating all aspects, scheduling, scope, and management of a team of approximately 300 construction contractors, 20 engineers, and 10-15 construction inspectors.

Prior to his promotion to the Plants and Major Projects Division, Plaintiff had been recognized in his 2015 Performance Review for "continu[ing] to grow as a leader" and "easily taking on increasing levels of responsibility." (AR 61). Eight months later in October 2016, Plaintiff was promoted to the Plants and Major Projects Division. His supervisor was Jay Allin ("Mr. Allin"), Director of the Plants and Major Projects Division. From that time until March 9, 2020, Plaintiff was assigned to manage projects that steadily increased in size and scope, even

being lauded by Mr. Allin, in his 2017 Performance Review for "tak[ing] on the highest profile projects and execut[ing] them exceptionally." (AR 68). After that review, Plaintiff's duties and responsibilities continued to materially increase and he was eventually given the responsibility over the Latham Gas Plant Project.

***Plaintiff's Employment after the Change in Control, from March 9, 2020 to June 4, 2020***

Plaintiff first experienced a Good Reason event on or around March 9, 2020. On that date, Plaintiff was assigned to manage two small projects: (1) the Wattenberg Engine Overhaul; and (2) the Ramsey Slug Catcher Project. According to Mr. Allin, the minimum experience required to be Project Manager for the Ramsey Slug Catcher Project was 1-2 years of engineer experience. In contrast, in order to be Project Manager for the Latham Gas Plant Project (Plaintiff's assignment immediately prior to the Change in Control), the minimum required experience necessary was at least 10 years of engineer experience and prior diverse project management experience (including Plaintiff's experience with managing compressors stations and pipelines and the construction portion of a train at the Ramsey Gas Plant). (AR 105). According to Mr. Allin, Plaintiff's experience-level was not required in managing projects like the Wattenberg Engine Overhaul and the Ramsey Slug Catcher and his marketability as a Project Manager was diminished by the smaller sizes, smaller budgets, and smaller scopes of these projects. (AR 109-110). Plaintiff's management responsibilities were over teams of 10-20 construction contractors, 1-2 engineers, and 1-2 construction inspectors. (AR 110).

During the next several weeks, additional indicators that Plaintiff's duties and responsibilities would continue to be materially and adversely diminished for the foreseeable future occurred. Specifically, toward the end of April 2020, Plaintiff was volunteered by his

supervisor, Mr. Allin, and Michael Forsyth, VP of Engineering, to join the MI team to assist with answering engineering questions for service evaluations and making other supporting calculations.  (AR 72-73).  The role that Plaintiff was formally introduced into by the MI Supervisor to the team on April 30, 2020, was not a project manager role at all.  (Id.)  At this point, Plaintiff's Project Manager role was effectively set aside.  He was no longer getting new Project Manager assignments, nor did he hold any comparable duties or responsibilities to the duties and responsibilities he held just prior to the Change in Control.

Additionally, just before Plaintiff resigned for Good Reason on June 4, 2020, the Wattenberg Engine Overhaul was deferred to 2021.  Accordingly, at the time of his termination for Good Reason on June 4, 2020, Plaintiff's duties and responsibilities as Project Manager had materially and adversely diminished from managing a $450 Million project, supervising over 300 workers and contractors, to running a single $600,000 project and answering engineering questions for service evaluations.  Plaintiff was responsible for budgeted projects equaling less than 0.14% of what he was responsible for just prior to the Change in Control.

### *Exhaustion of Administrative Claims Procedures*

On or about June 4, 2020, when Plaintiff did not have any major projects in his pipeline and was not being assigned any increased duties and responsibilities which were comparable to those he had before the Change in Control, Plaintiff resigned for Good Reason under the Plan.

To be eligible for Separation Benefits under the Plan, Plaintiff's resignation for Good Reason was required to be within 90 days of the Good Reason Event.  (AR 2).  Plaintiff resigned for Good Reason on the 87th day following the first Good Reason Event.

Plaintiff participated and exhausted the administration and claims procedures required under the Plan to obtain his Separation Benefits.  (AR 7, 8-14, 17-19).

Plaintiff's claim for Separation Benefits under the Plan was timely made pursuant to Article IX, Section 9.2 of the Plan on July 27, 2020 (AR 104-110), and denied by the Plan Administrator on January 24, 2021, one day after the latest deadline for decision of January 23, 2021 had expired.  (AR 92-102).

Plaintiff timely filed his appeal of the Plan Administrator's denial on March 11, 2021 (AR 48-73), and received the Plan Administrator's final decision denying his appeal on July 9, 2021.  (AR 31-46).  Plaintiff was notified that his claim was perfected (AR 32), and he may file a lawsuit no later than one year after the date of the final decision.  (AR 42).  Plaintiff timely commenced this action.

## ARGUMENT

### I.  STANDARD OF REVIEW

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263, 1266 (10th Cir. 2002).  If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, a court must review the decision under an "abuse-of-discretion (or arbitrary and capricious) standard."  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008); Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010 n. 10 (10th Cir. 2008) (equating abuse of discretion or arbitrary and capricious standard in denial

of ERISA benefits).  "An act is discretionary when a choice must be made in the exercise of judgment on what is proper under the circumstances."  Gust v. Coleman, 740 F.Supp. 1544, 1551 (D. Kan. 1990), aff'd, 936 F.2d 583 (10th Cir. 1991) (unpublished); Benson v. Hartford Life & Acc. Ins. Co., 511 Fed. Appx. 680, 683 (10th Cir. 2013).

However, where the plan administrator's decision relies on an interpretation of the language in the plan, this Court must consider whether the provision is ambiguous. If the plan documents, examined as a whole, are unambiguous, the Court must construe them as a matter of law.  Benson, 511 Fed. Appx. at 687 (citing Scruggs v. ExxonMobil Pension Plan, 585 F.3d 1356, 1362 (10th Cir. 2009).

Here, the language in the Plan is unambiguous. Therefore, the Plan Administrator's decision must be reviewed *de novo* with limited deference to the Plan Administrator's interpretation.

A.    **The Plan Administrator is Entitled to Less Deference Due to a Conflict of Interest**

Where "the administrator or fiduciary having discretion is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  Metro. Life Ins. Co., 554 U.S. at 112 (quoting Firestone Tire & Rubber Co., 489 U.S. at 115).  A plan administrator's dual role of both evaluating and paying benefits claims creates the kind of conflict of interest referred to in Firestone.  Metro. Life Ins. Co., 554 U.S. at 112.  "The Tenth Circuit has adopted a sliding scale, decreasing the level of deference in proportion to the severity of the conflict."  Pitman v. Blue Cross & Blue Shield of Oklahoma, 217 F.3d 1291, 1295 (10th Cir. 2000) (citing Jones v. Kodak Med. Assistance Plan, 169 F.3d

1287, 1291 (10th Cir. 1999)).  The conflict, then, is weighed as a factor in determining whether the plan administrator's decision was arbitrary and capricious.  Id.

Here, the Plan Administrator is made up exclusively of long-term Oxy executives.  (AR 261, 383, 494, 497, 499).  Further, Plan benefits to Participants are paid out by Oxy.  (AR 9-14).  Accordingly, Defendants' denial of Plaintiff's claim is subject to less deference because the Plan Administrator has a direct conflict of interest.  As the U.S. Supreme Court recognized, every dollar saved by employers is a dollar earned by employers.  See Metro. Life Ins. Co., 554 U.S. at 112 ("[W]here it is the employer that both funds the plan and evaluates the claims . . . [e]very dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket."); accord Yochum v. Barnett Banks, Inc. Severance Pay Plan, 234 F.3d 541, 544 (11th Cir. 2000) ("Where the funding for severance plans comes directly from the coffers of a company, rather than through a trust, there is a conflict of interest.").  This direct conflict cannot be ignored.

Moreover, corporate officers are incentivized "to maintain an economically healthy and successful company in order to ensure the viability and competitiveness of the company for the sake of their own job stability."  Pitman, 217 F.3d at 1296 (finding a conflict of interest); see also Yochum, 234 F.3d at 544 (finding a conflict of interest where the members of the committee making the benefits decision are employees of the company that would have to pay the benefits).

The Committee members held the following titles and tenures at Oxy as of 2021, when Plaintiff's appeal was denied:

- Angela Knight, Director HR Systems and Benefits Administration, 18 years;

- Michele Oubre, Vice President HR Strategy & Services, 28 years;

- Jim Tally, Vice President Compensation & Benefits, 25 years;

- Mark Grommesh, VP Business Development & Joint Ventures, U.S. Onshore Resources and Carbon Management, 23 years;

- Melissa Jenkins, Manager Executive Compensation & Equity, 9 years; and

- Madelaine Pfahler, Director Benefits and Well-Being, 15 years.

See Committee Members' LinkedIn Profiles (last visited June 9, 2022), attached as **Exhibit 1**.

Importantly, every person on the Health and Welfare Benefits Administrative Committee who participated in reviewing Plaintiff's claim for Separation Benefits is a long-term Oxy executive.  (AR 261, 383, 494, 497, 499).  Their denial of Plaintiff's claim saved Oxy nearly $700,000.  Their denial further provided their long-term employer stability during a period they described as an "economic crisis" and "a time that the oil industry was facing dire economic hardships."  (AR 35).  The clear incentive and conflict in issuing the denial cannot be ignored.

## II.    DENIAL OF PLAINTIFF'S CLAIM FOR SEPARATION BENEFITS UNDER THE PLAN WAS ARBITRARY AND CAPRICIOUS

In order to obtain benefits under the Plan, Plaintiff was only required to show that his duties and responsibilities were materially and adversely diminished in comparison to the duties and responsibilities he enjoyed immediately prior to the Change of Control.  (AR 6).

At the time of his termination for Good Reason on June 4, 2020, Plaintiff's duties and responsibilities as Project Manager for the Plants and Major Projects Division had materially and adversely diminished from managing a $450 Million project, supervising over 300 workers and contractors, to running a single $600,000 project and answering engineering questions for service evaluations.  At the time of his termination for Good Reason, Plaintiff was responsible for budgeted projects equaling less than 0.14% of what he was responsible for just prior to the

Change in Control.  According to Mr. Allin, prior to the Change in Control, Mr. Hoff's

management responsibilities were over a team of approximately 300 construction contractors, 20

engineers, and 10-15 construction inspectors.  (AR 71).  After March 9, 2020, Mr. Hoff's

management responsibilities were over teams of 10-20 construction contractors, 1-2 engineers,

and 1-2 construction inspectors.  (AR 71).

This diminishment is unquestionably material and adverse.  See Bowles v. Quantum

Chem. Co., 266 F.3d 622, 634 (7th Cir. 2001) (plaintiff entitled to severance under ERISA plan's

voluntary separation clause because his budget was reduced and his supervisory duties

eliminated); McClure v. Vice President, Human Res., Union Carbide Corp., CIV.A. H030054,

2005 WL 1214645, at *18 (S.D. Tex. May 20, 2005) (finding that when the employer took away

the employee's budget, staff, and membership on the plant management team, it eliminated

*material* components of his authority) (emphasis supplied); Daubertin v. HCR Manor Care, Inc.,

373 F.3d 822, 829 (7th Cir. 2004) (reduction of, among other things, executive's budget,

management, and hiring and firing authority, constituted "reduction in the scope of a

Participant's authority, position, title, functions, duties or responsibilities" so as to trigger

severance benefits under ERISA plan, despite "addition" to position responsibility for daily visits

to sites managed).

In order to deny the marked changes to Plaintiff's job duties and responsibilities as of

March 9, 2020, in comparison to what they were on August 7, 2019, Defendants resorted to

intentionally misinterpreting the Plan's requirements to irrelevant factors and imagined criteria.

**A.**   **The Plan Administrator's Reliance on the Absence of Promises or Guarantees to Plaintiff to Deny His Claim Was an Abuse of Discretion**

Defendants denied Plaintiff's claim for benefits based in part on the fact that he was not "guaranteed" or "promised" a certain number of direct reports or supervision over a particular number of people, nor was he "guaranteed" or "promised" a certain project size or budget size. (AR 33-34, 93-95).

Plaintiff, however, never claimed that he was guaranteed or promised a certain number of direct reports or supervision over a particular number of people, nor a certain size project or budget.  That is because the Plan does not require an employee to have first received a guarantee or promise of certain duties and responsibilities before determining whether or not those duties and responsibilities materially and adversely diminished.  (AR 6).

Defendants, for the first time, are now requiring Plaintiff to prove that he was given a guarantee he would only have comparable sized projects before Plaintiff can establish he suffered a material diminishment in duties and responsibilities when his project budget was reduced by 99.86% in a date-to-date comparison. This reading of the plain language is erroneous, arbitrary, and capricious.  This hurdle, concocted only to deny Plaintiff's specific claim, and not arising from any of the Plan's actual language, is evidence of the Plan Administrator's conflicted motive.

Defendants failed to act in accordance with the unambiguous Plan documents by inserting definitions that are nonexistent, not supported by the Plan's language, and which introduce requirements not contemplated by the Plan's plain language.

**B.**   **Reliance on Plaintiff's Job Title is Arbitrary and Capricious**

Importantly, to constitute Good Reason under the Plan, a change in job title is not required.  (AR 6).  Under the plain language of the Plan, it is of no relevance or legal consequence that Plaintiff remained a "Project Manager" when analyzing whether his duties and responsibilities were materially and adversely diminished.  Defendants arbitrarily and capriciously used Plaintiff's lack of title change to deny Plaintiff's claim for benefits.

When Plaintiff's assigned projects went from the largest projects in the Plants and Major Projects Division to projects that would not even qualify as projects assigned to the Major Projects Division just prior to the Change in Control, his duties and responsibilities were objectively and visibly materially and adversely diminished.  That he retained the title of "Project Manager" is of no legal consequence.  (AR 1-30).

The Plan Administrator repeatedly relies on the fact that Plaintiff's title was Project Manager before the Change in Control and his title remained Project Manager after the Change in Control.  (AR 32-37).  Focusing on Plaintiff's title is contrary to the Plan's plain terms, and even the Plan's own interpretation document.  (AR 86).  In its own examples of what does and does not constitute a material diminishment in duties, the Plan Administrator indicated that a change in job title is not dispositive.  (AR 86).  Yet, it is clear from reading the Committee's denial letter, the primary motivation in denying Plaintiff's claim was its conclusion that Plaintiff was a Project Manager before the Change in Control and a Project Manager after the Change in Control.  (AR 32-37).

Further, the Plan Administrator was insistent that if Plaintiff's new smaller projects were within the duties and responsibilities of a Project Manager (AR 37), or that Plaintiff was assigned

projects in the same way he was assigned projects prior to the Change in Control (AR 34), or that Plaintiff was not assigned projects differently than other Project managers (AR 37), that Plaintiff could not have suffered a material and adverse diminishment of duties and responsibilities.  The Plan Administrator misconstrues the Plan's plain language.  The Plan does not care that Plaintiff's duties and responsibilities are consistent with his job title; the Plan only cares if Plaintiff's duties and responsibilities on August 7, 2019 were materially and adversely diminished as of June 4, 2020.  The answer is unequivocally, yes.

Said another way, that Plaintiff's diminished duties and responsibilities were still arguably consistent with the job of Project Manager, is of no consequence under the Plan's plain language.  (AR 6).  The Plan Administrator's dependance on this irrelevant connection was entirely arbitrary and capricious.

### C.     The Plan Administrator's Focus on Causation is Contrary to the Plan's Plain Language

The Plan Administrator attempts to justify its denial by stating, "The smaller project size was due to the economic crisis associated with the COVID-19 pandemic and its effect on the oil industry." (AR 35). The Plan Administrator goes on to declare: "These changes in project size do not have any relation to the COC and were not determined by Oxy or WES.  The changes were part of normal economic fluctuations."  (AR 35).

Critically, under the plain and unambiguous language of the Plan, what (or who) caused the material and adverse diminishment of Plaintiff's duties and responsibilities is of absolutely no relevance.  As written, the Plan states no requirement that the diminishment of duties and responsibilities must have been caused by the Change in Control or must have been caused by Oxy or WES.  (AR 6).

The Plan Administrator cannot insert a causation requirement where none exists.  There is no ambiguity either.  The only relevant inquiry for comparison purposes is the date immediately prior to the Change in Control and the date Plaintiff's duties and responsibilities were materially and adversely diminished (if before the first anniversary of the Change of Control), and for whatever reason and by whatever cause.  (AR 6).

Under the Plan's terms, the fact that not the Change in Control, nor Oxy, nor WES, was the cause of the diminishment in Plaintiff's duties and responsibilities, makes no difference.  Nowhere in the 30 pages of the Plan, including three amendments, does the requirement that the diminishment be caused by the Change in Control (or caused by any particular circumstance for that matter), appear.  (AR 1-30).  The cause of the diminishment is entirely irrelevant and the Plan Administrator's continued reliance on causation is an abuse of discretion, confirming that the Plan Administrator's denial was arbitrary and capricious.

The only relevant portion of the Plan Administrator's statement is its admission that "the projects in 2020 were smaller than projects that were in place before the COC."  (AR 35).  That admission unequivocally establishes that Plaintiff's duties and responsibilities as Project Manager of Plants and Major Projects prior to the Change in Control were materially and adversely diminished because the projects in 2020 were smaller.  (AR 35).  Additionally, when the Plan Administrator admits Plaintiff was assigned smaller projects and asked to provide support to the MI team answering questions for service valuations "due to the slowdown in projects associated with the COVID-19 pandemic" (AR 35), the Plan Administrator effectively concedes Plaintiff's entitlement to benefits under the Plan's plain language.  (AR 6).

Notably, the Plan has no force majeure or other act of god-style clause.  (Id.)  Under the plain language of the Plan, a simple time-stamped snapshot comparison is required from immediately prior to the Change in Control to any time within the one-year following the date of the Change in Control.  (AR 6).  Nothing more is required of Plaintiff to establish Good Reason under section Art. II(s)(i) of the Plan.  (AR 6).  Inserting a causation requirement that is not contained in the Plan language, and then using that red herring to deny Plaintiff's benefits must be rejected by the Court.  Reliance upon wholly made-up requirements in order to deny a valid claim for benefits is a clear abuse of discretion.

D.   **The Plan Administrator's Contention (after the Fact and with the Benefit of Hindsight) that Plaintiff's Diminishment of Duties and Responsibilities Was Temporary as a Reason to Deny Plaintiff's Claim is an Abuse of Discretion**

On July 9, 2021, the Plan Administrator wrote about Plaintiff's smaller project assignments and his role as support for the MI team in March-June 2020: "This change was temporary and project work has been increasing as the economy has recovered."  (AR 35).

As of the date Plaintiff terminated his employment on June 4, 2020 for Good Reason, Plaintiff had not been assigned to manage any other projects other than the Ramsey Slug Catcher Project and the Wattenberg Engine Overhaul (which had been deferred to 2021 and was not guaranteed to be reassigned to Plaintiff in 2021).  (AR 70).

Despite not being a factor relevant to a Good Reason event as defined by the Plan (AR 6), Plaintiff's diminishment in job duties and responsibilities was not temporary.  When Plaintiff resigned for Good Reason, there were no upcoming or foreseeable major projects in his pipeline and in fact, he had been given an entirely new role as support engineer for the MI team, which carried no project management duties or responsibilities with it at all.  (AR 72-73).

The Plan Administrator points to its interpretation document where it stated that temporary changes do not constitute Good Reason events under the Plan.  (AR 85).  The Plan Administrator also claims that during its interview of Mr. Allin *in June 2021* and in order to support its denial of Plaintiff's claim, that "Mr. Allin told the Committee that he asked Mr. Hoff to assist with the MI Team due to the slowdown in projects associated with the COVID-19 pandemic."  (AR 35, 381).  "Mr. Allin told the Committee that working on the MI Team was not a permanent change but instead a temporary assignment to provide assistance while Mr. Hoff had availability."  (AR 35, 381).  None of these facts was known, nor claimed to have been known, as of March 9, 2020 or June 4, 2020.

Importantly, Mr. Allin does not claim that he told Plaintiff that his work on the MI Team would be temporary.  Plaintiff was never told this change was temporary.  When Plaintiff made his Good Reason inquiry on March 30, 2020, there were no upcoming or foreseeable projects in his pipeline, and as he understood: "This is not a temporary change as the capital program does not including funding of any comparable facility programs or projects at a minimum through 2020 [the next nine months] falling under my oversight."  (AR 595).

The Plan Administrator also notes in its denial letter "[t]hus, even if the changes in project activity were permanent, they were unrelated to any action that was taken by WES as the cause of the slowdown was an international economic development caused by the pandemic and unrelated to Oxy, WES or the COC."  (AR 36).  As mentioned above, the cause of the changes is of no importance.  What is important about this statement by the Plan Administrator, however, is that it operates as an admission that Oxy did not communicate to Plaintiff, nor did it know, that the changes were temporary (if they were), when the changes were made.

Indeed, there was no timeframe or expiration date communicated to Plaintiff regarding his reassignment to the MI team.  (AR 72-73).  A determination regarding whether there is an material and adverse diminishment of duties and responsibilities clearly must be made based on facts available at the time Plaintiff resigned for Good Reason, and not years later with the benefit of hindsight in order to argue that the changes were obviously "temporary," as the Plan Administrator does here (the appeal was decided on July 9, 2021, more than a year after Plaintiff resigned for Good Reason on June 4, 2020).

The Plan Administrator's interpretation document (AR 85-88), inserting a new requirement (this requirement is nowhere in the four corners of the Plan), stating that changes to duties must be permanent cannot open the door for the Plan Administrator to claim years after the fact, that challenged changes were just temporary, simply to avoid liability.  This non-temporary requirement, if properly applied despite not being included in the Plan document, is only reasonably applied when the temporary nature of the change is known during the Participant's employment and at the time of the Good Reason event.  A contrary requirement would be absurd.  Indeed, Oxy could claim, in order to defeat any beneficiary's claim for benefits at any time, that if they would have lasted just one more day, they would have been promoted to CEO.  The law is not so naïve.

As described above, Defendants failed to act in accordance with the documents and instruments governing the Plan by inserting terms into the definitions and Plan documents that are not there, are not supported by ambiguity in the Plan's language, and which introduce requirements to obtaining benefits that are not contemplated by the Plan.

Defendants arbitrarily and capriciously relied on Plaintiff's lack of title change and lack of guarantee or promise for certain size projects and certain levels of responsibilities (none of which are relevant to the definition of Good Reason under the Plan), to deny Plaintiff's claim for benefits.  Additionally, Defendants arbitrarily and capriciously based their denial of Plaintiff's claim for benefits on their unsupported conclusion that the material and adverse diminishment of Plaintiff's duties was not caused by the Change in Control or by Oxy or WES and that, in hindsight, the diminishment of duties was just temporary.  Nothing in the Plan requires the Change in Control to have caused the Good Reason event.  (AR 1-30).   And nothing in the Plan exempts an economic-based diminishment from constituting Good Reason either.  (AR 1-30).  In light of these facts, the decision made by the Plan Administrator was arbitrary and capricious and cannot not be upheld.  Defendant's denial of Plaintiff's claim under the Plan should be reversed and judgment should enter for the Plaintiff.

**III.   THE PLAN ADMINISTRATOR BREACHED ITS FIDUCIARY DUTY WHEN IT FAILED TO DISCHARGE ITS RESPONSIBILITIES AS SET FORTH IN THE PLAN DOCUMENTS "SOLELY IN THE INTEREST OF THE PARTICIPANTS AND BENEFICIARIES" AND INSTEAD TO ADVANCE ITS CONFLICTING INTEREST**

ERISA mandates that "a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with Title I of ERISA."  See ERISA Section 404(a), 29 U.S.C. § 1104(a)(1).

The Plan Administrator's conduct, therefore, must be analyzed in light of the fact that it was required to discharge its responsibilities as set forth in the Plan documents "solely in the

interest of the participants and beneficiaries."  Id.  Here, the Plan Administrator wholly disregarded its fiduciary duties by failing to comply with the Plan documents.

Further, in light of the Plan Administrator's stated concerns about the financial stability of the Company (and the oil industry in general), at the time it denied Plaintiff's claim (and offered the same as a reason for the denial of his claim – i.e., "even if the changes in project activity were permanent, they were unrelated to any action that was taken by WES as the cause of the slowdown was an international economic development caused by the pandemic and unrelated to Oxy, WES, or the COC." (AR 36)), the Plan Administrator breached its fiduciary duty to Plaintiff by elevating its conflicting interest over Plaintiff's interest as a Plan participant.

First, the cause of Plaintiff's diminishment of duties and responsibilities is not a relevant factor under the Plan's plain language.  (AR 6).  The Plan has no force majeure or other act of god-style clause.  (AR 1-30).

Second, "[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries."  Yochum, 234 F.3d at 546 (quoting Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1566-67 (11th Cir. 1990), overruled on other grounds by Metro. Life Ins. Co., 554 U.S. 105)); see also 29 U.S.C. § 1104(a)(1)(A)(i) (the administrators of an ERISA plan are to discharge their duties "for the exclusive purpose of providing benefits to participants and their beneficiaries").

This is exactly what happened here.  There is no evidence that the denial of benefits to Plaintiff was made with the best interests of the Plan's beneficiaries in mind.  Accordingly, the

Plan's denial of Plaintiff's claim based on its improper use of irrelevant factors outside the Plan's plain language was arbitrary and capricious because it advanced the Plan Administrator's conflicting interest of preserving Oxy's financial assets during what it called an "economic crisis," at Plaintiff's expense.

By expressly refusing to comply with the plain language of the Plan and elevating its conflicting interest over ERISA's mandate to discharge its duties solely in the interests of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries, the Plan Administrator has undoubtedly breached its fiduciary duty to Plaintiff and its denial should be set aside as arbitrary and capricious.

## CONCLUSION

Defendants' consideration of criteria outside of the plain language of the Plan to deny Plaintiff's benefits was an abuse of discretion (arbitrary and capricious).  Further, the Plan Administrator breach its fiduciary duty owed to Plaintiff by expressly refusing to comply with the plain language of the Plan and elevating its conflicting interest over its duty to act for the sole benefit of Plaintiff as a Plan participant and beneficiary.

For the foregoing reasons, Plaintiff respectfully seeks an Order from the Court finding that Defendants breached the duties, responsibilities and obligations imposed on them by ERISA, that Plaintiff suffered a Good Reason Event, resigned within 90 days of the Good Reason Event as required, and is therefore entitled to Separation Benefits under the Plan, enter judgment in Plaintiff's favor and against Defendants and order the Plan to pay Separation Benefits to Plaintiff in an amount equal to the contractual amount of benefits to which Plaintiff is entitled under the Plan, order Defendants to pay Plaintiff pre-judgment interest on all Separation Benefits due prior

to the date of judgment, declare that the Plan Administrator failed to comply with its obligations as a fiduciary under the ERISA Plan, order Defendants to pay the Plaintiff the costs of suit herein, and a reasonable attorneys' fee, pursuant to ERISA Section 502(g)(1), 29 U.S.C. §1132(g), and grant additional relief as allowed by statute and by applicable law in the form of statutory damages and penalties, and grant any and all equitable relief the Court deems just and proper.

Respectfully submitted this 26th day of August, 2022.

By:    /s/ *Leah P. VanLandschoot*
        Leah P. VanLandschoot, #35723
        Amy M. Maestas, #46925
        THE LITIGATION BOUTIQUE LLC
        78 W 11th Avenue
        Denver, Colorado 80204
        T: 303.355.1942
        F: 303.355.2199
        lvanlandschoot@thelitbot.com
        amaestas@thelitbot.com

        **ATTORNEYS FOR PLAINTIFF**
        **DAVID B. HOFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 26, 2022, a copy of the foregoing **PLAINTIFF'S OPENING BRIEF** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kimberly F. Cheeseman, Esq., kimberly.cheeseman@nortonrosefulbright.com
Andrew Yeh, Esq., andrew.yeh@nortonrosefulbright.com
Shauna Johnson Clark, Esq., shauna.clark@nortonrosefulbright.com

<u>/s/ *Leah P. VanLandschoot*</u>
Leah P. VanLandschoot