IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:21-cv-02589-DDD-MEH

DAVID HOFF,

     Plaintiff,

v.

AMENDED AND RESTATED ANADARKO PETROLEUM CORP. CHANGE OF CONTROL SEVERANCE PLAN; and
ANADARKO PETROLEUM CORPORATION HEALTH AND WELFARE BENEFITS ADMINISTRATIVE COMMITTEE,

     Defendants.

---

## ORDER

---

    This matter is before the Court following the denial of severance benefits governed by the Employee Retirement Income Security Act ("ERISA"). Defendant Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan ("Plan") is a benefits plan administered by Defendant Anadarko Petroleum Corporation Health And Welfare Benefits Administrative Committee ("Committee"). The Plan was put in place by Anadarko Petroleum Corporation ("Anadarko") and provides severance benefits in the event of a change of control. Plaintiff David B. Hoff was an employee of Anadarko and Occidental Petroleum Corporation ("Oxy") after it acquired Anadarko. As an employee of Anadarko prior to the acquisition, Mr. Hoff was a participant under the Plan.

    Mr. Hoff resigned from his employment and submitted a claim for severance benefits under the plan, asserting that his duties and responsibilities had been materially adversely affected. The Plan, based on a

decision by the Committee, denied his claim and administrative appeal on the basis that his responsibilities had not been permanently reduced. Mr. Hull then filed this lawsuit, arguing that the Plan wrongfully denied his claim and that the Committee violated its fiduciary duties in doing so.

The Parties filed the administrative record and completed the briefing contemplated by the Scheduling Order. (Docs. 16, 26-1.) Thereafter, Defendants sought leave to file a sur-reply. (Doc. 33.) Leave was granted. (Doc. 38.) Mr. Hoff sought leave to file a further response, which was denied. (Doc. 41, 43.) Defendants filed a notice of supplemental authority. (Doc. 44.)

This matter has been fully briefed by the parties. (Docs. 30, 31[1], 32, 39.) Defendants filed a Motion for Determination (Doc. 40), which is granted consistent with this Order.

## BACKGROUND

Anadarko initially adopted a severance plan on January 29, 1998. (Doc. 26-1 at 3., Administrative Record ("R.") at 2.) The current Plan was adopted on September 1, 2007. (R. 5.) It was amended with a First Amendment adopted on April 15, 2008, a Second Amendment adopted on October 26, 2009, and a Third Amendment adopted on December 20,

---

[1]    Defendants styled their response as Defendants' Response To Plaintiff's Motion For Summary Judgment, Cross Motion For Summary Judgment, And Motion For Entry Of Judgment For Defendants. (Doc. 31.) Mr. Hoff did not file a motion for summary judgment, no such motions were contemplated by the Scheduling Order, and the inclusion of a motion in a response is specifically barred by Local Civil Rule 7.1(d). (Docs. 16, 30.) Rather than striking Defendants' filing, the Court construes it as the "response brief on the merits" contemplated by the Scheduling Order. (Doc. 16 at 3.)

2010. (R. 2-30.) The provisions triggering a right to benefits are contained in Article 4, Separation Benefits, which provides in relevant part:

> 4.1 <u>Right to Separation Benefits</u>. A Participant shall be entitled to receive Separation Benefits as provided in <u>Section 4.3</u> if a Change of Control occurs and his or her Employment terminates under a circumstance specified in <u>Section 4.2(a)</u>. An additional Change of Control shall not trigger any additional Separation Benefits for the Participant.
>
> 4.2 <u>Termination of Employment</u>.
>
> (a) Terminations Which Give Rise to Separation Benefits Under This Plan.
>
> . . .
>
> (ii) A termination for Good Reason during the Applicable Period; <u>provided</u>, <u>that</u>, the Participant terminates his or her Employment within ninety (90) days of such occurrence; . . .

(R. 8-9.)

A "Good Reason" is defined in relevant part in Article 3 as:

> (s) <u>Good Reason</u>. Good Reason shall mean the occurrence of any of the following:
>
> (i) the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control;
>
> . . .
>
> (iv) the Participant is required to be based at a location more than 25 miles from the primary location where the Participant was based and performed services immediately prior to the Change of Control;
>
> (v) the Participant is required by the Employer to take an assignment or position that requires him or her to travel on frequent overnight trips resulting in extended

stays away from home on a consistent basis and to a sub-
stantially greater extent than was required immediately
prior to the Change of Control (this provision excludes as-
signments or positions that might require temporary travel
for a specified, short duration of time, regardless of
whether such assignment or position is the result of cir-
cumstances related to the Change of Control);

(R. 6.)

As part of the First Amendment, Article 9 of the Plan provides cer-
tain discretion to the Committee in interpreting the plan:

(g) Effect of Committee Action. The Plan shall be inter-
preted by the Committee in accordance with the terms of
the Plan and their intended meanings. However, the Com-
mittee shall have the discretion to make any findings of
fact needed in the administration of the Plan, and shall
have the discretion to interpret or construe ambiguous, un-
clear or implied (but omitted) terms in any fashion that the
Committee deems to be appropriate in its sole judgment.
The validity of any such finding of fact, interpretation, con-
struction or decision shall not be given de novo review if
challenged in court, by arbitration or in any other forum,
and shall be upheld unless clearly arbitrary or capricious.
. . .

(R. 23.)

Oxy acquired Anadarko on August 8, 2019 ("Change of Control"). It
is undisputed that this was a Change of Control under the Plan's lan-
guage that potentially triggered rights under the Plan. (R. 4-5.)

Prior to the Change in Control, on August 7, 2019, Plaintiff was a
Project Manager for the Plants and Major Projects Division for Ana-
darko. (R. 92-93.) With the Change in Control, Oxy became Mr. Hoff's
employer. At the time, Mr. Hoff was assigned to and responsible for the
Latham Gas Plant Project, the largest project of the company at the
time. In this role, Mr. Hoff was responsible for a $450 Million combined

- 4 -

project budget that required management of a team of over 300 people.
(R. 104.) The minimum required experience for this role was 10 years of
engineer experience and prior diverse project management experience.
(R. 105.)

On September 10, 2019, the Committee released the Anadarko Pe-
troleum Corporation Change of Control Severance Plan Interpretation
by the Plan Administrator and Examples ("Examples"). (R. 85.) It was
provided "subject to the terms" of the Plan and provided that, "[i]f there
is a difference between the information in this communication and the
[Plan] document, the [Plan] document will control." (R. 85.) The Exam-
ples provided several scenarios potentially relevant here:

> The change to duties must be permanent. A short-term re-
> duction in duties due to lack of work, transition, reorgani-
> zation, or similar matters does not qualify.
>
> <u>Example</u>: During the integration of Oxy and Anadarko,
> work slows down while management reviews work pro-
> cesses. Because this is temporary, it does not qualify.
>
> <u>Example</u>: A supervisor states that one or more job duties
> held by the employee has been taken away. This is a per-
> manent change.
>
> Note: As described in more detail below, the change must
> also be material in order to be considered a Good Reason
> event. Not all changes in job duties will be material.
>
> . . .
>
> The reduction in duties must be material when compared
> to the duties performed prior to the Change of Control.
>
> *Management*
>
> <u>Example</u>: An employee went from managing ten employees
> to one employee after the Change of Control. This is a ma-
> terial diminishment.

- 5 -

> Example: An employee went from managing ten employees
> to eight employees after the Change of Control. This is not
> a material diminishment.

(R. 85-86.)

On March 9, 2020, the Latham Gas Plant Project was successfully completed under Mr. Hoff's supervision. Mr. Hoff was reassigned to manage two small projects: (1) the Wattenberg Engine Overhaul; and (2) the Ramsey Slug Catcher Project. These roles required 1-2 years of engineering experience and involved management of a team of less than 25 people.

On April 30, 2020, Mr. Hoff was introduced as a resource to the Mechanical Integrity team to assist with answering engineering questions for service evaluations and making other supporting calculations. (R. 72-73.) He was volunteered for this role by his supervisor, Mr. Allin, and the VP of Engineering, Michael Forsyth, because Mr. Hoff still had available time. This was not a project manager role.

On June 4, 2020, the Wattenberg Engine Overhaul project was deferred to 2021. (R. 51.) Mr. Hull was not given any other project management assignments. (R. 50.) Mr. Hull resigned the same day. (R. 31.)

On June 27, 2020, Mr. Hull filed a claim, asserting that he resigned in relation to a Good Reason event. (R. 104.) His claim included a declaration from his supervisor, Mr. Allin. (R. 108.)

By letter dated January 22, 2021, the Committee denied Mr. Hull's claim. (R. 92.)[2] As part of its decision-making process, the Committee interviewed Mr. Allin. (R. 94.)

On March 11, 2021, Mr. Hull filed an appeal. (R. 48.) The Committee denied the appeal on July 9, 2021, for essentially the same reasons it previously stated after interviewing Mr. Allin again. (R. 31, 37.)

On September 23, 2021, Mr. Hoff filed his complaint containing claims for improper denial of benefits under 29 U.S.C. § 1132(a)(1)(B) and breach of fiduciary duty under 29 U.S.C. § 1104(a). (Doc. 1.)

## STANDARD OF REVIEW

A "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). To the extent that the plan administrator is given discretionary authority, a court applies the arbitrary and capricious standard of review. *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

Under the arbitrary and capricious the court must uphold the determination "so long as it was made on a reasoned basis and supported by

---

[2]    Mr. Hull and the Committee each raised timeliness arguments about certain documents in course of the claims process. (R. 37-40.) None of these issues are raised before the Court.

- 7 -

substantial evidence." *Id*.[3] "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (cleaned up). In determining whether the evidence in support of the administrator's decision is substantial, the court must take into account record evidence that detracts from its weight. *Id*. "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell*, 287 F.3d at 1282. The court also gives less deference if a plan administrator fails to examine relevant evidence. *Id*.; *see also Mason v. Reliance Standard Life Ins. Co.*, No. 14-CV-01415-MSK-NYW, 2015 WL 5719648, at *7 (D. Colo. Sept. 30, 2015).

## DISCUSSION

## I. Determination of the Applicable Standard of Review for ERISA Claim

The parties dispute whether the *de novo* standard or the arbitrary and capricious standard is applicable in this case. Mr. Hoff asserts that the *de novo* standard applies because the "language in the Plan is un-ambiguous" and the Plan provides limited discretion to the Committee. (Doc. 30 at 10.) Defendants do not dispute that the plan language is un-ambiguous, but they assert that the arbitrary and capricious standard

---

[3]    The Tenth Circuit uses "a sliding scale approach where the reviewing court will always apply an arbitrary and capricious standard, but will decrease the level of deference given in proportion to the seriousness of the conflict." *Weber*, 541 F.3d at 1010 (cleaned up). "The importance of a conflict of interest 'is proportionate to the likelihood that the conflict affected the benefits decision.'" *Van Steen*, 878 F.3d at 997 (quoting *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009)). The Court does not reach this issue because it play no role in the decision.

should apply because "Section 9.3(g) of the Plan specifically provides the Committee with the power to interpret the Plan and to make a determination as to the right of any person to benefits under the Plan." (Doc. 31 at 14.)

In determining the appropriate standard, "it is essential to focus precisely on what decision is at issue, because a plan may grant the administrator discretion to make some decisions but not others." *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1266 (10th Cir. 2002). Here, the Plan unambiguously provides discretion to the Committee in specific instances, but also limits that discretion.

The Plan requires that it be "interpreted by the Committee in accordance with the terms of the Plan and their intended meanings." (R. 23.) The Plan, however, provides "discretion to make any findings of fact needed in the administration of the Plan, and . . . to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment." (R. 23.) As further clarification, the Plan provides that the "validity of any such finding of fact, interpretation, construction or decision shall not be given de novo re-view if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious." (R. 23.) Thus, in accordance with this language, the Court must apply an arbitrary and capricious standard to the Committee's findings of fact and interpretations of language that is ambiguous, unclear, or implied but omitted. *Graham*, 589 F.3d at 1358.

Applying this language here, the Court must give deference to the Committee's findings regarding what Mr. Hoff's position was before and after the Change of Control. *See Nance*, 294 F.3d at 1267-68 (affirming

that the administrator was given discretion over factual findings). Those facts, fortunately, are undisputed. Mr. Hoff states:

> Plaintiff admits that his title of "Project Manager" did not change between August 7, 2019 (the day prior to the Change in Control) and June 4, 2020 (the date of his termination for Good Reason). Plaintiff admits that between March 9, 2020 and June 4, 2020, Oxy did not have any comparable size projects to the one he was managing on August 7, 2019. Plaintiff admits that he was not demoted in title or salary by Oxy. Plaintiff admits that he was never promised that the projects he would manage as Project Manager would only ever increase in size. Plaintiff also admits that he was never guaranteed certain size projects or certain levels of responsibility. Plaintiff admits that there may have been larger projects that could have been assigned to him in the future if he had stayed employed with Oxy. Finally, Plaintiff admits that the material and adverse diminishment of his duties and responsibilities was not caused by the Change in Control, nor was it caused by any intentional conduct by Oxy.

(Doc. 30 at 3.)

Regarding the Committee's interpretations of the Plan and application of the plan language, the Court will apply the *de novo* standard. As noted, Defendants do not assert that any of the relevant language is ambiguous or unclear and do not assert that any of the interpretations are meant to cover implied but omitted terms. (Doc. 31 at 18-19.) The Plan's grant of discretion to the Committee on such matters is therefore not applicable here.

ERISA and the related caselaw do not prescribe a separate standard of review to the application of plan language to facts. *Firestone Tire & Rubber Co.*, 489 U.S. at 115. The Supreme Court instead has adopted the *de novo* standard for all issues where a plan does not give the plan administrator discretion. *Id.*; *see also Nance*, 294 F.3d at 1266. Further, the Plan makes explicit the Plan should be interpreted by the

Committee using its term's intend meanings, thereby limiting the Committee's discretion in plan interpretation outside of the enumerated exceptions. (R. 23.) Thus, this case differs from cases where the administrator is explicitly provided with general interpretive authority by explicitly providing discretion, for example, to "construe the terms of the Plan, . . . and to determine any questions which may arise with the Plan's application or administration, including but not limited to determination of eligibility for benefits" as in *Martinez*, 795 F.3d at 1214.[4] Here, the grant of discretion is explicitly limited to limited circumstances not present in this record. Accordingly, a *de novo* standard applies to issues other than the Committee's factual determinations.

## II. Merits of the ERISA Wrongful Denial Claim

Because the parties do not dispute that a Change of Control occurred and what Mr. Hoff's responsibilities and duties were prior to and after the Change of Control, the key issue is whether Mr. Hoff resigned for "Good Reason" under the Article 3(s) of the Plan. Therefore, the issue is whether Mr. Hoff's "duties and responsibilities as an Employee [were] materially and adversely diminished in comparison to the duties and responsibilities enjoyed by [Mr. Hoff] immediately prior to the Change of Control."

---

[4]  The Court has carefully considered *Lu v. Anadarko Petroleum Corp. Welfare Benefits Admin. Comm.*, No. CV H-22-709, 2023 WL 5254682 (S.D. Tex. Aug. 15, 2023), cited as supplemental authority cited by Defendants. There the parties agreed to an abuse of discretion standard. *Id.* at 7. The Court is not persuaded by this case for the reasons set out above.

### A. Application of the Facts to the Plan Language

Prior to the Change of Control, Mr. Hoff was a Project Manager in the Plants and Major Projects Division for Anadarko. At the time in that role, Mr. Hoff had responsibility for Latham Gas Plant Project's $450 million budget and his duties included leading and coordinating all aspects, scheduling, scope, and management of a team of over 300 people for that project.

At the time of his resignation, Mr. Hoff was a Project Manager for Oxy with responsibility for managing the Ramsey Slug Catcher Project with a budget of $600,000. His duties included leading a team of fewer than 25 people as part of this project. Mr. Hoff, moreover, was assigned to assist the Mechanical Integrity team with answering engineering questions for service evaluations and making other supporting calculations, a duty with no project management or supervisory responsibilities.

Applying the Plan language, the Court finds that Mr. Hoff's duties and responsibilities were materially and adversely diminished from the period prior to the Change of Control. While Mr. Hoff retained his Project Manager title and responsibility for the projects assigned to him at least part time, his duties and responsibilities for Oxy were far less than the responsibility and duties that he had previously enjoyed. Mr. Hoff's assignment to answer engineering questions and assist with calculations has no apparent analogue in his role prior to the Change of Control, where he worked solely as a Project Manager with responsibility for Anadarko's largest project, including extensive supervisory responsibilities. This support role does not hold any comparable responsibilities or duties to Mr. Hoff's project management role that comprised the entirety of this role prior to the Change of Control. The change from a

full-time management role to working a significant portion of time supporting another unit in a comparatively limited capacity was material in substantially changing Mr. Hoff's job and adverse in substantially diminishing his responsibilities. Those duties and responsibilities assigned to Mr. Hoff in project management, moreover, were orders of magnitude reduced from those he enjoyed prior to the Change of Control. The diminution in his product management duties and responsibilities is apparent from his having so much spare time that he was assigned the support role.

Defendants raise several arguments based on the Committee's rationale to support its contrary conclusion. They argue, for example, that Mr. Hoff retained the same duties and responsibilities as a Project Manager even though the project assigned to him was smaller and that the reduction in his responsibilities was temporary.

### B. Mr. Hoff's Retention of a Project Manager Role Part-Time Does Not Show His Duties Were Undiminished.

While Defendants acknowledge that the Ramsey Slug Catcher Project was much smaller in responsibilities than the Latham Gas Plant Project, Defendants argue that it is the duty and responsibility of Project Mangers to manage the projects assigned to them, regardless of size, and that there is no guarantee or expectation that all projects will be of the same size. (Doc. 31 at 21-24.)

In denying the appeal, the Committee reasoned:

> Every Project Manager would like to work solely on projects like the Latham Gas Plant Project. However, projects of the scope and size of the Latham Gas Plant Project are rare, as the Latham Gas Plant Project was one of the largest projects at Anadarko. It is not reasonable for Mr. Hoff or any Project Manager to believe that because he or she had an opportunity to work on a large project, he or she

would thereafter only work on projects of the same scope and size.

Mr. Hoff's job as a Project Manager was to manage the projects of the company – whether at Anadarko, Oxy or WES. Projects vary in size and scope based on the needs of the respective company; while Mr. Hoff may rather work on projects like the Latham Gas Plant Project, such projects are not always consistent with goals of the company or are not possible due to economic factors. The projects that are undertaken and assigned to a Project Manager depend on a Project Manager's workload, the economy and the company's resources and planning goals. Small projects are equally critical to the ongoing operation of the company as big projects, and the Project Manager's job is to handle all of the projects in his or her role of supporting the company.

(R. 36.) The Committee noted that "there were no other larger projects available to be assigned to Mr. Hoff (other than in West Texas and Mr. Hoff expressed that he did not want to travel)." (R. 34.)

There are three main problems with this argument. First, it does not account for Mr. Hoff's reassignment to support the Mechanical Integrity unit. Second, it sweeps too broadly in effectively allowing retention of job title to prevent analysis of actual duties and responsibilities as well as being inconsistent with other guidance provided by the Committee. Third, as applied to Mr. Hoff, it is inconsistent with the unambiguous Plan language.

First, as discussed above, the replacement of a significant portion of Mr. Hoff's project management work with a role supporting another team was a material adverse change on its own. The Committee did not analyze this change in Mr. Hoff's job duties, instead reasoning that the change was temporary based on events that occurred after he resigned. (R. 32-36, 93-96.) Defendants make no argument here that such a change was not a diminishment of responsibility. (Doc. 31 at 16-17.) Indeed, Defendants describe the role as merely "helping the Mechanical

Integrity ('MI') team with questions." (*Id.* at 13.) That is a lesser role than project management of major projects that must be considered. *Caldwell*, 287 F.3d at 1285 (explaining that a well-reasoned benefits decision must consider all essential job duties).

Second, the Committee's argument relies too heavily on Mr. Hoff's job description, rather than his actual duties and responsibilities, contrary to the Plan language and the Committee's Examples. While it is undoubtedly true that Project Managers are responsible for performing the duties assigned to them regardless of the size of the project, this is more a truism of employment than something unique to project management. Street sweepers sweep streets regardless of length. Judges manage the cases assigned to them regardless of complexity. The Plan refers specifically to "duties and responsibilities" and asks whether they were materially "diminished." Thus, the inquiry must be into whether Mr. Hoff had materially less duties and responsibilities than before the Change of Control. He did. Other courts have found on similar facts and plan language that the material diminishment in responsibilities and duties occurred despite retention of job title and some responsibilities consistent with that title. *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 634 (7th Cir. 2001) (affirming a grant of benefits where "changes had a meaningful impact" on duties despite job title remaining consistent); *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 829 (7th Cir. 2004) (finding a reduction in responsibilities where the employee "had the same list of duties before and after the merger; she just had fewer facilities in which to perform them").

Indeed, the Committee appears to have recognized the proper inquiry in the Examples it propounded regarding what constituted a Good Reason. The Examples state that it would be a material diminishment if an "employee went from managing ten employees to one employee

after the Change of Control." (R. 86.) Mr. Hoff's reduction in supervisory responsibilities was a more than ten to one reduction (greater than 300 to less than 25). The Committee's finding that Mr. Hoff's reduction in management responsibilities was not material runs contrary to its interpretation of the plan in the Examples. Such inconsistent interpretation and application is an abuse of discretion that would warrant reversal even under that standard. *Allison v. Bank One-Denver*, 289 F.3d 1223, 1236 (10th Cir. 2002), *as amended on denial of reh'g* (June 19, 2002) ("We have repeatedly rejected efforts to stray from the express terms of a plan, regardless of whom those express terms may benefit."); *Lickteig v. Business Men's Assurance Co.*, 61 F.3d 579, 585 (8th Cir. 1995).

Finally, the Committee's analysis is inconsistent with the Plan more broadly. The Plan protects employees not only from having their role reduced, but it also protects them from having to relocate. In addition to a reduced role constituting a "Good Reason," it is also a Good Reason when an employee is "required to be based at a location more than 25 miles from the primary location where the Participant was based and performed services immediately prior to the Change of Control" or is required to travel frequently. (R. 6.) The Committee found that there were large projects available in West Texas but rejected the relevance of these projects based on Mr. Hoff's preference not to travel or relocate. (R. 34.) This reasoning is contrary to the Plan's unambiguous language because it makes a protected decision (not to relocate or travel) a basis for denying that a Good Reason exists (the reduction in responsibilities).

Even if the Court were applying an arbitrary and capricious standard, it would reject Defendant's arguments. The Committee's failure to consider Mr. Hoff's support assignment, reliance on his Project Manager job title, and contradictory interpretation of the Plan would all warrant

reversal. *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996) ("[I]f fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious."); *Gosselink v. Am. Tel. & Tel., Inc.*, 272 F.3d 722, 726 (5th Cir. 2001) (holding that, in determining whether a misinterpretation of a plan was an abuse of discretion, "a court must consider: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.")

### C. The Plan Does Not Exclude Temporary Changes and, Instead, Requires Prompt Resignation.

Defendants also assert that Mr. Hoff's reduction in duties and responsibilities was only temporary and therefore could not constitute a Good Reason under the Plan. This argument has no basis in the Plan language and is, instead, contrary to the Plan.

Defendants base this argument in the Examples, which state that, to be considered a Good Reason, a "change to duties must be permanent." (R. 85.) The Examples interpret the Plan such that "short-term reduction in duties due to lack of work, transition, reorganization, or similar matters does not qualify." (R. 85.) The contrasting examples provided are that "work slows down while management reviews work processes" during the integration of the companies, which is temporary, compared to a circumstance where a "supervisor states that one or more job duties held by the employee has been taken away," which is a "permanent change." (R. 85.) In denying the appeal, the Committee reasoned:

> The smaller project size was due to the economic crisis associated with the COVID-19 pandemic and its effect on the oil industry. Mr. Hoff terminated employment at the beginning of the COVID-19 crisis and during a time that the oil industry was facing dire economic hardships. This change

> was temporary and project work has been increasing as the
> economy has recovered. . . .
>
> Mr. Allin told the Committee that he asked Mr. Hoff to as-
> sist with the MI Team due to the slowdown in projects as-
> sociated with the COVID-19 pandemic. Mr. Allin told the
> Committee that working on the MI Team was not a perma-
> nent change but instead a temporary assignment to pro-
> vide assistance while Mr. Hoff had availability. The Com-
> mittee previously determined in September 2019 that tem-
> porary changes do not constitute Good Reason events un-
> der the [Plan]. *See* [Examples].

(R. 85.)

Nowhere in the Examples or the Administrative Record does the
Committee explain how the Examples are consistent with the Plan lan-
guage or allege that they fill in some implied but omitted term of the
Plan. Rather, the Examples state that they are "intended to constitute
general information" and subject to the terms of the Plan, which con-
trols. (R. 85.) Defendants argue that the Examples are an "interpreta-
tion" of the Plan, but do not identify any ambiguity or implication in the
Plan language that the Committee is granted authority to interpret.
(Doc. 31 at 12.) As such, the Plan language controls. *McGee v. Equicor-
Equitable HCA Corp.*, 953 F.2d 1192, 1201 (10th Cir. 1992) (finding plan
language controlled even in the face of conflicting interpretation that
gave precedence to plan language).

The Plan as amended unambiguously limits the Committee's discre-
tion to interpret the plan to a few circumscribed categories, none of
which are present. In all other circumstances the Plan explicitly re-
quires that the Committee use the terms "intended meanings." (R. 23.)
Such interpretation based on intention is consistent with basic princi-
ples of contract interpretation. *Pirkheim v. First Unum Life Ins.*, 229
F.3d 1008, 1010 (10th Cir. 2000) ("We give the words their common and

ordinary meaning, as a reasonable person in the position of the plan participant (not the actual participant) would have understood them") (citations omitted). There is nothing in the Plan that limits a Good Reason to generally to a permanent change or implies that a temporary change cannot be a Good Reason. Rather, the Plan terms are to the contrary of this interpretation.

The Plan sets short timelines for an employee to terminate their employment after any change in employment to be considered for severance benefits. Specifically, the Plan requires that the "Participant terminate[] his or her Employment within ninety (90) days of such occurrence" in order for the occurrence to be considered a Good Reason that could entitle the employee to severance benefits. (R. 8.) The Parties do not identify anywhere that the Plan provides for an extension of this period or otherwise allow for the possibility that temporary changes in work duties and responsibilities would not constitute a Good Reason.[5] Rather, the Plan includes an explicit provision specifying particular temporary occurrences as not constituting a Good Reason. With respect to an employee being required to travel more than before the Change of Control, the Plan explicitly "excludes assignments or positions that might require temporary travel for a specified, short duration of time." (R. 6.) No corresponding term exists in relation to diminishment in an employee's duties and responsibilities or any other Good Reason. (R. 6.) Thus, it is apparent that the Plan excluded specific temporary circumstances where intended and did not generally exempt temporary changes from constituting Good Reason.

---

[5]   Notably, the Plan does not include any *force majeure* clause or similar term.

Here again, even if the Court were applying an arbitrary and capricious standard, it would reject Defendant's arguments. The Committee points to nothing in the plan that could constitute a reasonable basis to exclude all temporary circumstances from constituting a Good Reason. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1037–38 (7th Cir. 1990) (holding that guidelines contradicting a plan's requirements were arbitrary and capricious).

### D. Hoff's Breach of Fiduciary Duties Claim is Duplicative.

Mr. Hoff's second claim asserts that the Committee breached its fiduciary duty through its interpretations of the policy to deny him benefits. (Doc. 30 at 21-23.)  Defendants respond that "Hoff's breach of fiduciary claim is duplicative of his claim for alleged improper denial of benefits." (Doc. 31 at 29.) In his reply, Mr. Hoff does not dispute that his claim is duplicative in this case or indicate any additional relief that he would be entitled to if he also prevailed on this claim. (Doc. 32 at 18-19.)

I agree with the other judges in this District that have examined the issue and concluded that breach of fiduciary duty claims are duplicative of claims for wrongful denial of benefits. *Williams v. Metro. Life Ins. Co.*, No. 07-CV-2062-REB-CBS, 2011 WL 97137, at *11 (D. Colo. Jan. 11, 2011), *aff'd*, 459 F. App'x 719 (10th Cir. 2012) (discussing *Klover v. Antero Healthplans*, 64 F. Supp. 2d 1003, 1012 (D. Colo. 1999)). Accordingly, Mr. Hoff's claim for breach of fiduciary duty will be dismissed.

### CONCLUSION

Based on the foregoing, I find that Mr. Hoff was subject to a Good Reason event within the meaning of the Plan and resigned within 90 days of that event. I further find that Mr. Hoff is entitled to Separation Benefits under the Plan. I will grant Plaintiff his costs and

grant pre-judgment interest consistent with the statutory rate under Colorado law for the benefits accrued prior to the date of judgment. *See Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008).

It is therefore **ORDERED** that:

The Motion for Determination, **Doc. 40**, is **GRANTED** consistent with this Order;

Plaintiff's second cause of action is **DISMISSED**;

Defendants' decision is **REVERSED**;

The Plan shall pay Plaintiff Separation Benefits consistent with the Plan;

Plaintiff is granted pre-judgment interest on his Separation Benefits that accrued prior to the date of judgment at the rate set by C.R.S. § 5-12-102(2);

Plaintiff is awarded his reasonable costs in an amount to be determined later; and

Judgment shall enter in favor of Plaintiff and against Defendants.

DATED: October 19, 2023                BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge